Felton J. EARLS III, Petitioner,

v.

Stanley R. RESOR, Secretary of the Army, Commanding Officer, U. S. Army Reserve Components Personnel Center, Fort Benjamin Harrison, Indiana, Commanding Officer, Brooke Army Medical Center, Fort Sam Houston, Texas, Respondents.

No. 70 Civ. 4823.

United States District Court, S. D. New York.

Dec. 28, 1970.

Kunstler, Kunstler & Hyman, New York City, for petitioner; Steven J. Hyman, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., New York City, for respondents; John F. McHugh, Asst. U. S. Atty., of counsel.

## MEMORANDUM OPINION

LASKER, District Judge.

This case presents the question whether an Army reservist who submits an application for conscientious objector discharge subsequent to the receipt of his call-up order but prior to his actual activation date is entitled to have his application processed before, rather than after, his entry onto active duty.

Felton J. Earls III is a medical doctor holding the rank of Captain in the United States Army Reserve. In 1961, while an undergraduate at Howard University, he enlisted in the United States Army Reserve Officers Training Corps and, upon his graduation in June 1963, he was commissioned a Second Lieutenant in the United States Army Reserve. Thereafter, in June of 1967, upon graduation from Howard University Medical School, plaintiff was transferred to the Army Reserve Medical Corps. At that time, also, he enrolled in the "Berry" plan which entitled him to a deferred status pending the completion of his postgraduate medical training at the University of Wisconsin, where he was a Fellow in the Department of Neurophysiology, and at the New York College of Medicine, where he recently completed his internship.

Subsequently, plaintiff went to work in the Community Health Program of the New York College of Medicine at Metropolitan Hospital in New York City. On or about June 22, 1970, he received orders to report for active military duty at Fort Sam Houston, Texas, as of November 5, 1970, for training and subsequent assignment to Vietnam.

On July 29, 1970, plaintiff sent a letter to his commanding officer at Fort Benjamin Harrison, Indiana, indicating that he desired to apply for conscientious objector status and requesting the necessary forms. Thereafter, on or about August 7, 1970, he received a communication from Fort Benjamin Harrison, Office of Personnel Operations, advising him as to the form of the application and place of submission, and enclosing a copy of the applicable Army regulations, namely AR 135–25. Plaintiff was advised at that time to submit his completed forms to Fort Benjamin Harrison, which, as the analysis below indicates, may be of some significance.

On September 21, 1970, Dr. Earls returned his completed conscientious objector form, together with numerous letters of reference, to Fort Benjamin Harrison. In that application as well as in his affidavit dated November 2, 1970, in support of the instant motion, plaintiff stated (and it is nowhere contradicted) that his beliefs in regard to conscientious objection crystallized only after he had read the decision of the United States Supreme Court in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (June 15, 1970), and after he had received his active duty orders the following week. As he indicated at page 5 of his application:

"It has taken the reality of my activation to the military to congeal my belief in opposing participation for reasons of conscience. It has been a difficult decision to reach, but I think that I can honestly say today that I will never participate in a war of any kind, so long as human life and property are destroyed, no matter what the cause.

"I believe that the influences have been present in my life for a long while, but not until two months ago had they acted on my life in a way to lead me to become a conscientious objector."

Dr. Earls also noted in his application his willingness to work under the Selective Service civilian work program for conscientious objectors and to consent to the issuance of an order for such work by his local Selective Service Board.

Following the submission of his application, plaintiff received no further communication from the Reserve Center until October 29–30, 1970, when his attorney was advised by telephone that Dr. Earls' application for discharge as a conscientious objector could not be acted upon at Fort Benjamin Harrison before he reported for active duty on November 5, 1970, and would therefore be forwarded to the commanding officer at Fort Sam Houston for processing at his new duty station. Plaintiff's request for a delay of his activation date pending a decision on his application was denied.

Plaintiff thereupon commenced this action on November 3, 1970, on which day this court granted a stay enjoining defendants from requiring plaintiff to report to active duty on November 5, 1970, pending the return date of the order to show cause and a decision thereon.

Plaintiff brought on this petition for a writ of mandamus to require defendants to process plaintiff's application for conscientious objector discharge while he is in a reserve status and, pending such processing, to prohibit defendants from ordering him to active duty. Jurisdiction of this court is invoked, *inter alia,* under 28 U.S.C. § 1361. Plaintiff now moves for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, restraining defendants from enforcing plaintiff's active duty order pending a full hearing and determination on the merits of his petition.

Of course, a preliminary injunction constitutes an extraordinary remedy which will not be granted except upon a clear showing of probable success on the merits and possible irreparable injury. However, "where the balance of hardships tips decidedly toward the party requesting the temporary relief," Dino De Laurentiis Cinematografica, S. P. A. v. D–150, Inc., 366 F.2d 373, 375 (2d Cir. 1966), the burden of demonstrating the likelihood of success is lessened. In such a case, it is sufficient if plaintiff "has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953). See also Semmes Motors, Inc. v. Ford Motor Company, 429 F.2d 1197, 1205–1206 (2d Cir. 1970); Checker Motors Corporation v. Chrysler Corporation, 405 F.2d 319, 323 (2d Cir. 1969). As noted below, I find plaintiff to have met this burden on the facts of the instant case and, accordingly, the preliminary injunction will be granted.

Plaintiff, with justification, relies heavily on the decision of Judge Croake of this court in the recent case of Gordon v. Resor, 323 F.Supp. 268 (S.D.N.Y. September 4, 1970). But for one notable exception, the *Gordon* case is on all fours in both law and fact with the matter herein. Indeed, were it not for this single distinguishing feature I would without further ado adopt the *Gordon* decision as controlling law in the instant litigation, for I find myself in full accord with the able analysis of the court there. In *Gordon*, plaintiff, also a doctor in the Army Reserve, filed his conscientious objector application subsequent to receiving his orders to report for active duty but eleven days prior to his actual activation date. On the basis of an asserted Department of the Army policy and the Army's interpretation of AR 135–25, the Army took the position that, due to the lateness of Dr. Gordon's application, it would not consider him under Army regulations set up for reservists not on active duty, specifically AR 135–25, but rather would require him to submit to activation and cause his application to be processed under Army regulations established for activated Army personnel, specifically AR 635–20. Although the version of AR 135–25 then in effect made no provision one way or another for the handling of conscientious objection claims filed after an applicant's receipt of his active duty orders, the Army followed a policy of forwarding to the particular reservist's future active duty commander any application filed "on the

eve" of the reservist's active duty date; any application filed before the "eve" of a reservist's activation, however, would be processed at his reserve post even if this required an amendment of the reservist's orders.[1] Nevertheless, after a thorough review of the applicable law and regulations, the *Gordon* court found this policy for the treatment of applications filed on the eve of activation to be inconsistent with and violative of both the letter and spirit of the pertinent provisions of AR 135–25 and the Department of Defense Directive, DOD 1300.6, upon which it is based, and therefore granted plaintiff's request for a preliminary injunction.

The critical distinction between the case at bar and the *Gordon* case is that, effective August 15, 1970, Army Regulation 135–25 was amended to include the following provision:

"8. *Assignment.* \* \* \*

a. Normally a minimum period of 90 days is required to finalize the processing of an application submitted in accordance with this regulation. The submission of an application for discharge by reason of conscientious objection subsequent to the date the individual's orders are published announcing reporting date for active duty or active duty for training is *not* a basis for delay in reporting for designated duty. In the event an individual is ordered to report to active duty or active duty for training while a request for discharge under this regulation is being processed, and the individual is advised that final action cannot be made prior to his reporting date for duty, the individual will be required to comply with his orders. In such instance, his application will be forwarded to the appropriate Active Army commander for processing."

Therefore, this court must now consider what legal effect, if any, this change in the regulation has on the holding in the *Gordon* case. The Army does not dispute that the amendment to AR 135–25 merely constitutes the formalization, as a written provision, of almost [2] the same unwritten Army policy which was in effect at the time of the *Gordon* case and which was disapproved by the *Gordon* court. What defendants do contend, however, is that, whereas in *Gordon* the Army was following a policy in conflict with applicable Defense Department and Army regulations, it is in the instant case following the amended regulation precisely as written. In reply, plaintiff argues that, even with the formal change in the wording of AR 135–25, the procedure contemplated therein is still violative of the language and policy of the parent Defense Department Directive (DOD 1300.6) and the remaining provisions of AR 135–25 as interpreted by the *Gordon* court.

It is settled that the federal courts will not interfere with lawful military duty assignments of persons lawfully in the armed forces, Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). Dr. Earls, however, contends not only that his assignment to active duty constitutes an unlawful order under the applicable military regulations, but that he is not lawfully in the armed forces inasmuch as he is entitled to discharge as a conscientious objector. The latter question as to the merits of his application is, of course, not presently before the court. What is before the court for preliminary review is the question whether under the appli-

---

1. Interestingly enough, as regards the instant case, this procedure for "on the eve" applications had supplanted an earlier policy which provided that only conscientious objector applications filed more than *90 days* prior to a reservist's active duty date would be processed at his reserve station. As is discussed at length later in the text, it is this once-rejected 90-day policy, now reincarnated in the form of a written amendment to AR 135–25, which constitutes the basis of the present lawsuit.

2. See footnote 1 and accompanying text.

cable regulations plaintiff must be kept in his reserve status pending action on his request for conscientious objector classification and discharge. In this regard it is clear, as the Court of Appeals for this Circuit stated in Smith v. Resor, 406 F.2d 141, 146 (2d Cir. 1969), that

" * * * a federal court may properly examine the decision to call a reservist for active duty in order to determine if the reservist's procedural rights under the applicable statutes and military procedures and regulations were violated in a manner which caused substantial prejudice to the reservist. This does not involve any undue interference with the proper and efficient operation of our military forces because we require only that the Army carry out the procedures and regulations it created itself."

Thus, this court has the power, indeed the duty, to review actions by military authorities to determine whether they have followed their own established regulations, as, of course, they must. See Hammond v. Lenfest, 398 F.2d 705, 715 (2d Cir. 1968); United States ex rel. Mankiewicz v. Ray, 399 F.2d 900, 902 (2d Cir. 1968).

Accordingly, plaintiff's request for relief must be examined against the standards of the various directives, regulations and policies adopted by the military for the processing of conscientious objector claims filed by Army personnel (like plaintiff) in a non-activated reserve status.

From early in the nation's history to the present, the government has followed a consistent policy of respecting the conscientious objection of prospective inductees.[3] Despite this long-standing policy of exempting conscientious objectors prior to induction, the Department of Defense, up until 1962, had no procedures permitting the discharge of enlisted or inducted military personnel who became conscientious objectors after entering the service, and the present draft law, 50 U.S.C.App. § 456(j), was clearly inapplicable to those already in the armed forces. See Hammond v. Lenfest, *supra*, 398 F.2d at 708. In 1962, however, the Secretary of Defense issued Department of Defense Directive 1300.6 (August 21, 1962), which was thereafter replaced by the current DOD 1300.6, issued May 10, 1968. The latter directive provides, in pertinent part, that

"The fact of conscientious objection does not exempt men from the draft. However, the Congress, * * *, has deemed it more essential to respect a man's religious beliefs than to force him to serve in the Armed Forces * * *

"Consistent with this national policy, bona fide conscientious objection as set forth in this Directive by persons who are members of the Armed Forces will be recognized to the extent practicable and equitable." DOD 1300.6, Part IV.

This and all other provisions of DOD 1300.6 are clearly applicable to plaintiff as a member of the Army Reserve by reason of Part II thereof, which states:

"The provisions of this Directive apply to the Military Departments and govern personnel of the Army, Navy, Air Force, and Marine Corps and all Reserve components thereof."

In accordance with this directive, the Department of the Army promulgated its own implementing regulations, namely, AR 135–25, to govern the disposition of conscientious objector claims made by Reserve members of the Army. It was pursuant to this regulation that Dr. Earls sought his discharge.

Plaintiff makes several serious challenges, under the applicable directives and regulations, to the validity of the procedure provided for by Section 8(a) of AR 135–25. First, plaintiff rightly points to the fact that DOD 1300.6, un-

---

3. For an extensive review of the history of the special treatment afforded conscien-tious objectors, see United States v. Geary, 368 F.2d 144 (2d Cir. 1966).

like the amended version of its offspring AR 135–25, imposes no time limit whatsoever as to how far in advance of activation a reservist must file his application for conscientious objector discharge in order to have it processed prior to his entrance on active duty. Indeed, AR 135–25 itself, which purports to carry out the policy of DOD 1300.6 vis-a-vis non-activated reservists, states under the "Applicability" provision (Part II) of the regulation that "[t]his regulation applies to *all* Reserve members of the Army" (emphasis added) but for certain specified exceptions, namely, those reservists in active military service or on initial active duty for training. Nowhere does the "Applicability" provision state that only those reservists who file their applications more than 90 days prior to their active duty date shall be eligible for treatment under the regulation. Rather, this provision appears to make the regulation equally applicable to all reservists not on active duty at the time of submission of their application irrespective of the date thereof. Such a construction of AR 135–25 would seem to accord with the language of DOD 1300.6, which, as noted above, contains no limitation of the type provided for by AR 135–25(8) (a) and which appears to contemplate equal treatment under the regulation for all reservists.

More important, perhaps, than the absence of any such limiting language in the Defense Department's original directive is the violence such a limitation could do to the intent of that directive—that is, to render military policy regarding conscientious objection of members of the armed forces consistent with national policy regarding conscientious objection of Selective Service registrants. Concededly, if plaintiff were to report to active duty, his application for conscientious objector discharge would be processed in the normal course under the procedures set forth in AR 635–20 for the treatment of conscientious objector claims submitted by activated army personnel. However, it is also quite clear that under AR 635–20 a non-activated reservist (like plaintiff) whose application is to be forwarded pursuant to Section 8(a) to his future Active Army commander for processing cannot avail himself of the relief provided by AR 635–20 until such time as he is actually activated. Similarly, Section 8(a) creates the distinct possibility that the processing of an application submitted by a reservist within 90 days of his activation date will be, at best, abruptly interrupted and delayed by its being forwarded to the appropriate active duty commander for completion, or, at worst, not commenced at all and entirely deferred until one's entrance on active duty. The latter possibility is, of course, entirely contrary to the policy of DOD 1300.6 and, indeed, AR 135–25 itself, for it would render this regulation (AR 135–25), which, as noted earlier, purports to apply to *all* reservists at *all* times, a nullity as regards those reservists submitting applications for discharge within the 90-day hiatus period. Those reservists would be effectively denied review of their applications while in a reserve status, and AR 135–25 would be for them no more than a mail chute for the transmittal of their applications to the appropriate active duty commander. The Army maintains that such an eventuality would be highly unlikely under the new provision of AR 135–25 in that "[i]n cases where the proximity of the date of application to the reporting date prohibits completion of all uniformly established required processing actions, the application is completed to the maximum extent possible and then forwarded to the active Army station of initial assignment for continued processing." (Affidavit of Lt. Col. Festus E. Wallace, undated.) Nevertheless, it remains the fact that even under this announced policy, and despite the fact that Dr. Earls filed his application some 45 days in advance of his active duty reporting date, not even the earliest processing procedures called for by AR 135–25(7)—e. g., a chaplain's interview, psychiatric interview—were

initiated on his application.[4] In any event, even if processing had been tentatively begun on his application immediately upon its submission, a substantial period of delay would undoubtedly have been necessary in order to forward plaintiff's records and other reports to his new active duty station and to afford the appropriate personnel at that station time to acquaint themselves with his file. Under these circumstances, the following language from the *Gordon* opinion appears pertinent:

> "Are we to conclude then that there is a hiatus during which time neither AR 135–25 nor AR 635–20 applies, despite the clear policy of DOD 1300.6? The answer must be no. The incongruity of such hiatuses was pointed out by Judge Kaufman writing for the Court of Appeals in United States v. Gearey \* \* \* \*"

In *Gearey*, the Court of Appeals was confronted with the analogous situation under the draft law of a Selective Service registrant who filed his application for conscientious objector status in the interim period after the receipt of his induction notice but before his actual induction. In holding that the registrant was entitled to have his application considered *by the local board* (and not, after induction, by the military) if his beliefs were found to have crystallized after the receipt of his induction notice, the court stated:

> "The long history of exempting conscientious objectors, coupled with the specific *statutory* right of appeal, indicate to us a strong Congressional policy to afford meticulous procedural protections to applicants who claim to be conscientious objectors, and indeed

to grant deferments in appropriate cases. Implementation of that policy requires that any individual who raises his conscientious objector claim promptly after it matures—even if this occurs after an induction notice is sent but before actual induction—be entitled to have his application considered by the Local Board." (emphasis in original). *Gearey, supra,* 368 F.2d at 150.

Indeed, the *Gearey* doctrine has now been extended to encompass claims by registrants who assert their conscientious objections to military service for the first time at the induction station. See United States v. Stafford, 389 F.2d 215 (2d Cir. 1968); United States v. Holmes, 426 F.2d 915 (2d Cir. 1970).

Clearly, the Department of Defense intended to incorporate the "strong Congressional policy to afford meticulous procedural protections to applicants who claim to be conscientious objectors" in its own directive regarding the conscientious objections of members of the armed forces. Consequently, if Selective Service law requires the local board to accept and consider prior to induction the claim of a registrant who submits his application for conscientious objector status during the interim period between the receipt of his induction notice and induction itself, it follows that DOD 1300.6 may require a Reserve commander to process prior to activation the claim of a reservist who submits his application for discharge in the interim period between the receipt of his active duty orders and his activation date. In any case, at least a serious and substantial question has been raised as to whether the hiatus effect created by the 90-day

---

4. As of the date of filing of this opinion, no decision, as far as this court has been informed, has been rendered on plaintiff's application, although more than 90 days have elapsed since the submission thereof. While it is doubtful that plaintiff could *require* the Army to process his claim within such a limited period of time, I intimate no view at this time as to whether, on a different set of facts, "military personnel could seek judicial review of the failure of military authorities to act upon such a request within a reasonable time." Kimball v. Commandant Twelfth Naval District, 423 F.2d 88, 91, n. 2 (9th Cir. 1970). Nevertheless, inasmuch as a claim of conscientious objection clearly results in a requirement that the claim be processed, it is not inconceivable that such a claim also carries with it a requirement of reasonable dispatch.

provision of AR 135–25 is permissible within the language and policy of DOD 1300.6.

Perhaps the most serious charge plaintiff levels against Section 8(a) is based upon Part VI of DOD 1300.6, which provides in part as follows:

"B. With respect to persons who have already served a portion of their obligated service who request discharge or non-combatant service for conscientious objection, the following actions will be taken:

"1. * * *

"2. *Pending decision on the case* and to the extent practicable the person will be employed in duties which involve the *minimum conflict* with his asserted beliefs." (emphasis added).

Indeed, the "minimum conflict" doctrine espoused in DOD 1300.6 has been incorporated in the express language of AR 135–25 itself, Section 8 thereof providing:

"An individual who applies for discharge based on conscientious objection will be assigned duties providing the *minimum conflict* with his pro-

fessed beliefs and will be required to maintain the same standards of performance and behavior as other personnel assigned to his unit *pending a final decision on his application.*" [5] (emphasis added).

Plaintiff argues that to require him to enter upon active duty (with almost certain subsequent reassignment to Vietnam) prior to a determination on his request for conscientious objector status would directly contravene "the desirable policy of sparing the applicant from duty which might do impermissible violence to the type of belief he now claims to entertain." Hancock v. Laird, 415 F.2d 234, 236 (9th Cir. 1969), (referring to the equivalent "minimum conflict" provision found in AR 635–20). To say, as the Army does, that once plaintiff is activated he can avail himself of the similar protection afforded activated Army personnel by the minimum conflict provision of AR 635–20 would appear unresponsive to the mandate of DOD 1300.6, for it is precisely that status in the active Army which he finds in conflict with his position of conscientious objection. In order to secure preliminary re-

5. The language of this section also points up another possible inconsistency created by the introduction of the 90-day provision into AR 135–25. For, whereas Section 8(a)—i. e., the 90-day provision—would require a reservist to report to active duty pending final action on his application for discharge, the words "as other personnel assigned to his unit" in Section 8 above would seem to provide, impliedly if not expressly, for the retention of the individual in his reserve unit pending final processing of his application.

Section 8(a) appears inconsistent with other provisions of AR 135–25 as well. As is noted earlier in the text, plaintiff was advised to submit his completed conscientious objector forms to his Reserve commander at Fort Benjamin Harrison. This instruction was apparently dictated by Section 6(b), which provides in part that "the application for discharge will be submitted to the commander having custody of the member's records," and by Section 6(b) (1), which states that in the case of Army Reserve members assigned to units, the commander having

such custody is "the commanding officer of the unit to which assigned." AR 135–25 then goes on to provide, in Section 7(a) thereof, that "Commanders having custody of the member's records will take" certain prescribed actions to process and evaluate applications for conscientious objector status. The purpose of requiring the commander in custody of a particular reservist's records to take the appropriate processing actions is to insure "that a serviceman's conscientious objector claim [is] processed at the site where his service record is ordinarily located and where there is more likelihood that there will be access to relevant history bearing upon the determination of the applicant's sincerity." Hancock v. Laird, 415 F.2d 234, 236 (9th Cir. 1969) (commenting on a similar provision in AR 635–20). This objective is surely not met by forwarding, in the midst of processing, both an applicant and his records and application to an unknown Active Army commander at a new and unfamiliar active duty post. Yet this is precisely what Section 8(a) would require.

lief plaintiff need not establish with finality at this stage that compelling him to move from reserve to active status constitutes more than a "minimum conflict" with his professed beliefs. It is enough that he has raised a serious and substantial question undermining the validity of Section 8(a), a question which requires further investigation and deliberation. Hamilton Watch Co. v. Benrus Watch Co., *supra*; Semmes Motors, Inc. v. Ford Motor Company, *supra*.

Even if the legal arguments above failed to furnish sufficient grounds for the grant of preliminary relief, the peculiar facts of Dr. Earls' case might well, on their own, provide an adequate basis therefor. In this regard it must be recalled that the 90-day provision of AR 135–25 did not become legally effective *until August 15, 1970*. Nevertheless, although plaintiff originally wrote to his reserve commanding officer requesting the appropriate application forms on July 29, 1970, and actually received a return communication by August 7, 1970, more than a week before Section 8(a) was to go into effect, Dr. Earls was never advised that the 90-day provision included in the copy of AR 135–25 sent to him was inapplicable to him at the time of receipt and that, in effect, if he were to submit his conscientious objector application before the August 15 effective date, the Army would be required (as the *Gordon* court later found) under its former regulation to process his request for discharge prior to his entrance on active duty. However, even if plaintiff had been advised of the inapplicability of the new amendment at the time he received the regulation, a substantial question exists as to whether under any circumstances Section 8(a) can be deemed binding on any reservist who received his orders to report to active duty prior to the August 15 effective date of the new provision. The real question is whether the 90-day provision should be construed as applying to those reservists like plaintiff who received their active duty orders before August 15 but filed their conscientious objector applications after that date, or only to those reservists who both received their active duty orders *and* submitted their applications after August 15. The latter construction seems the more reasonable, since it would assure full notice of both the minimal 90-day processing delay and the risk of activation inherent therein to every reservist who may file, or may already have filed, an application for discharge subsequent to receiving his active duty orders. Under the alternative construction, on the other hand, a reservist could conceivably have received his notice of activation months in advance of the August 15 effective date of Section 8(a), never have been notified of the change in the regulation, and have submitted his application for discharge (prior to activation) on August 15 itself or immediately thereafter. In such a case, the applicant would soon discover that his reliance up to that time on the language of the former regulation (i. e., AR 135–25 without Section 8(a)) had been misplaced and that simply because of his accidental decision to file his application on the day of, rather than the day before, August 15, he along with his application would soon be transferred into the active Army against his professed convictions. Indeed, plaintiff himself experienced much the same fate, for he received his active duty orders almost two months before the effective date of the amendment and yet was not put on notice of the proposed change in the regulations until almost the date it would become effective. And when he did finally receive notice of the new provision, he was led to believe, as is noted above that it was too late for him to do anything to avoid its effect. Even assuming *arguendo* the validity of the 90-day provision, its applicability to any particular reservist should not be made to turn on the mere happenstance of a filing date. To construe Section 8(a) as applying only to those reservists who receive, or have received, their active duty orders on or after August 15 would result in minimal, if any, prejudice to the Army. It would affect only that small

group of individuals (of whom there are undoubtedly few, if any, remaining at this time) who, like plaintiff, received their notice of activation prior to August 15 but submitted their application for discharge after that date, and as to them it would only serve to remove the unfair possibility of short notice and surprise, and guarantee treatment under the unamended version of AR 135–25 actually in effect at the time they received their active duty orders.

Finally, a word should be said on the issue of irreparable injury. Plaintiff states that it will violate his scruples to be compelled to submit to active duty. Certainly there is substantial and undisputed evidence in the record of the sincerity of plaintiff's beliefs. In addition, as Judge Croake pointed out in the *Gordon* case, the denial of a preliminary injunction in the instant case would be tantamount to the denial of the substantive relief sought, for by the time of trial damage will have been done. On the other hand, the Army will not be severely prejudiced by the operation of an injunction during the pendency of this action, for it will in effect only be required to follow the very same policy and regulation it had always followed, without great difficulty, up to the time of the August 15 amendment. Such an "imbalance of hardship" dictates the issuance of a preliminary injunction in the instant case.

Accordingly, in light of the foregoing amalgam of serious and substantial legal questions requiring more deliberate inquiry at trial, and the balancing of hardships, the preliminary injunction is granted, continuing the stay of plaintiff's activation pending a trial and determination of the merits of plaintiff's claims.

Pursuant to Rule 52(a) F.R.Civ.P., this opinion constitutes the court's findings of fact and conclusions of law.

Submit order.